NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 95

No. 2016-253

| | |
|---|---|
| State of Vermont | Original Jurisdiction |
| v. | Superior Court, Bennington Unit, Criminal Division |
| Rebekah S. VanBuren | March Term, 2017<br>April Term, 2019 |

David A. Howard, J.

William H. Sorrell, Attorney General, and Benjamin D. Battles, Assistant Attorney General, Montpelier, and Erica Marthage, Bennington County State's Attorney, and Alexander Burke, Deputy State's Attorney, Bennington, for Plaintiff-Appellant.

Matthew F. Valerio, Defender General, and Dawn Matthews, Appellate Defender, Montpelier, for Defendant-Appellee.

Bridget C. Asay of Donofrio Asay PLC, Montpelier, for Amici Curiae Cyber Civil Rights Initiative and Vermont Network Against Domestic and Sexual Violence.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.


¶ 1.    **ROBINSON, J.**   This case raises a facial challenge to Vermont's statute banning disclosure of nonconsensual pornography. 13 V.S.A. § 2606. We conclude that the statute is constitutional on its face and grant the State's petition for extraordinary relief.

I. "Revenge-Porn," or Nonconsensual Pornography Generally

¶ 2.    "Revenge porn" is a popular label describing a subset of nonconsensual pornography published for vengeful purposes. "Nonconsensual pornography" may be defined generally as "distribution of sexually graphic images of individuals without their consent." D. Citron & M. Franks, Criminalizing Revenge Porn, 49 Wake Forest L. Rev. 345, 346 (2014). The term "nonconsensual pornography" encompasses "images originally obtained without consent

(e.g., hidden recordings or recordings of sexual assaults) as well as images originally obtained with consent, usually within the context of a private or confidential relationship." Id.[1] The nonconsensual dissemination of such intimate images—to a victim's employer, coworkers, family members, friends, or even strangers—can cause "public degradation, social isolation, and professional humiliation for the victims." C. Alter, " 'It's Like Having an Incurable Disease': Inside the Fight Against Revenge Porn," Time.com, http://time.com/4811561/revenge-porn/ [https://perma.cc/G9UP-L984]. The images may haunt victims throughout their lives. Id. (describing lasting effects of having one's nude photos posted online and stating that "this type of cyber crime can leave a lasting digital stain, one that is nearly impossible to fully erase").

¶ 3. This problem is widespread, with one recent study finding that "4% of U.S. internet users—roughly 10.4 million Americans—have been threatened with or experienced the posting of explicit images without their consent." See Data & Society, "New Report Shows That 4% of U.S. Internet Users Have Been a Victim of 'Revenge Porn,' " (Dec. 13, 2016), https://datasociety.net/blog/2016/12/13/nonconsensual-image-sharing/ [https://perma.cc/26FC-937V]; see also C. Alter, supra (stating that "Facebook received more than 51,000 reports of revenge porn in January 2017 alone"). Revenge porn is overwhelmingly targeted at women. D. Citron & M. Franks, supra, at 353-54 (citing data that victims of revenge porn are overwhelmingly female).

¶ 4. Forty states, including Vermont, have enacted legislation to address this issue. See Cyber Civil Rights Initiative, 40 States + DC Have Revenge Porn Laws, https://www.cybercivilrights.org/revenge-porn-laws/ [https://perma.cc/83UK-KKUS] (collecting state statutes). Federal legislation has also been proposed. See Intimate Privacy Protection Act of

---

[1] The basis for the dissent's suggestion that the revenge porn statute "was an attempt to protect against the mortifying consequences of sexting" is unclear. Post, ¶ 73. Both the statutory definitions and scholarly literature concerning nonconsensual pornography describe a range of circumstances, including nonconsensual dissemination of photographs or videos taken in the privacy of one's home in the context of an intimate relationship with a reasonable expectation that they will remain private.

2

2016, H.R. 5896, 114th Cong. (2016), https://www.congress.gov/bill/114th-congress/house-bill/5896 [https://perma.cc/RM6V-865X] (proposing to "amend the federal criminal code to make it unlawful to knowingly distribute a photograph, film, or video of a person engaging in sexually explicit conduct or of a person's naked genitals or post-pubescent female nipple with reckless disregard for the person's lack of consent if the person is identifiable from the image itself or from information displayed in connection with the image," with certain exceptions); Servicemember Intimate Privacy Protection Act, H.R. 1588, 115th Cong. (2017), https://www.congress.gov/bill/115th-congress/house-bill/1588 [https://perma.cc/7ZBK-KT49] (proposing to "amend the Uniform Code of Military Justice to prohibit the nonconsensual distribution of private sexual images").

## II.  Vermont's Statute

¶ 5.     Vermont's law, enacted in 2015, makes it a crime punishable by not more than two years' imprisonment and a fine of $2,000 or both to "knowingly disclose a visual image of an identifiable person who is nude or who is engaged in sexual conduct, without his or her consent, with the intent to harm, harass, intimidate, threaten, or coerce the person depicted, and the disclosure would cause a reasonable person to suffer harm."  13 V.S.A. § 2606(b)(1).[2]  "Nude" and "sexual conduct" are both expressly defined.  The law makes clear that "[c]onsent to recording of the visual image does not, by itself, constitute consent for disclosure of the image."  Id. Violation of § 2606(b)(1) is a misdemeanor, unless a person acts "with the intent of disclosing the image for financial profit," in which case it is a felony.

¶ 6.     Section 2606 does not apply to:

(1) Images involving voluntary nudity or sexual conduct in public or commercial settings or in a place where a person does not have a reasonable expectation of privacy.

(2) Disclosures made in the public interest, including the reporting of unlawful conduct, or lawful and common practices of law

---

[2]  The potential penalty is increased to five years' imprisonment, $10,000, or both when the disclosure is made for financial profit.  13 V.S.A. § 2606(b)(2).

3

enforcement, criminal reporting, corrections, legal proceedings, or medical treatment.

   (3) Disclosures of materials that constitute a matter of public concern.

   (4) Interactive computer services, as defined in 47 U.S.C. § 230(f)(2), or information services or telecommunications services, as defined in 47 U.S.C. § 153, for content solely provided by another person. This subdivision shall not preclude other remedies available at law.

Id. § 2606(d)(1)-(4).[3]

¶ 7. The law also provides a private right of action "against a defendant who knowingly discloses, without the plaintiff's consent, an identifiable visual image of the plaintiff while he or she is nude or engaged in sexual conduct and the disclosure causes the plaintiff harm." Id. § 2606(e)(1). In such cases, the court may order equitable relief, including restraining orders and injunctions, "[i]n addition to any other relief available at law." Id. § 2606(e)(2).

### III. Facts and Proceedings Before the Trial Court

¶ 8. In late 2015, defendant was charged by information with violating 13 V.S.A. § 2606(b)(1). In support of the charge, the State submitted an affidavit from a police officer and a sworn statement from complainant, which was incorporated into the officer's affidavit by reference. The parties agreed that the trial court could rely on these affidavits in ruling on the motion to dismiss; the parties later stipulated to certain additional facts as well.

¶ 9. The police officer averred as follows. Complainant contacted police after she discovered that someone had posted naked pictures of her on a Facebook account belonging to Anthony Coon and "tagged" her in the picture.[4] Complainant called Mr. Coon and left a message

---

   [3] Although the discussion below refers to "nonconsensual pornography" generally, the analysis is focused on the acts specifically defined and proscribed by the Vermont statute.

   [4] "Tagging" another user on Facebook creates a link to their Facebook profile. "What is Tagging and How Does It Work?," https://www.facebook.com/help/124970597582337/ [https://perma.cc/A5UG-WSZ7]. If the user tags someone else in their post, the post could be visible to the audience that the user selected plus the friends of the tagged person. Id.

4

asking that the pictures be deleted. Shortly thereafter, defendant called complainant back on Mr. Coon's phone; she called complainant a "moraless pig" and told her that she was going to contact complainant's employer, a child-care facility. When complainant asked defendant to remove the pictures, defendant responded that she was going to ruin complainant and get revenge.

¶ 10. Complainant told police that she had taken naked pictures of herself and sent them to Mr. Coon through Facebook Messenger. She advised that the pictures had been sent privately so that no one else could view them. Defendant admitted to the officer that she saw complainant's pictures on Mr. Coon's Facebook account and that she posted them on Facebook using Mr. Coon's account. Defendant asked the officer if he thought complainant had "learned her lesson."

¶ 11. In her sworn statement, complainant provided additional details concerning the allegations above. She described her efforts to delete the pictures from Facebook and to delete her own Facebook account. Complainant stated that the night before the pictures were publicly posted, she learned through a friend that defendant was asking about her. Defendant described herself as Mr. Coon's girlfriend. Complainant asked Mr. Coon about defendant, and Mr. Coon said that defendant was obsessed with him and that he had never slept with her. Complainant "took it as him being honest so we moved on." The next day, complainant discovered that defendant posted her nude images on Mr. Coon's Facebook page. A judge found probable cause for the charge against defendant in December 2015.

¶ 12. In February 2016, defendant filed a motion to dismiss. She argued that 13 V.S.A. § 2606 violated the First Amendment to the U.S. Constitution because it restricted protected speech and it could not survive strict scrutiny. Defendant also asserted that complainant had no reasonable expectation of privacy because she took the pictures herself and messaged them to Mr. Coon without any promise on his part to keep the pictures private. Defendant cited 13 V.S.A. § 2606(d)(1), which provides an exception from liability for individuals who disclose "[i]mages

involving voluntary nudity or sexual conduct in public or commercial settings or in a place where a person does not have a reasonable expectation of privacy."[5]

¶ 13.   The State opposed the motion.  With respect to the First Amendment, the State argued that the expression covered by the statute was not protected speech, and alternatively, that the statute was narrowly tailored to achieve compelling State interests.  As to defendant's second argument, the State asserted that complainant had a reasonable expectation of privacy in the pictures.  It explained that complainant used an application that allows one Facebook user to privately send text messages to another Facebook user, and it argued that complainant reasonably expected that only Mr. Coon would access the pictures.  The pictures only became public, the State contended, because defendant logged into Mr. Coon's Facebook account without permission, accessed his private messages, and then posted the pictures on Mr. Coon's public feed where other Facebook users could view them.  The State further argued that the reasonable expectation of privacy contemplated by the statute concerned the "place" where the pictures were taken, not the method by which the pictures were initially shared.  It argued that the method of initial publication was relevant to whether complainant consented to defendant's disclosure under § 2606(b)(1), but complainant unquestionably did not consent to the disclosures here.  Finally, the State asserted that the question of whether complainant had a reasonable expectation of privacy—either when the pictures were first taken or when they were later sent to Mr. Coon—was a question of fact that was not appropriate for resolution on a motion to dismiss.

¶ 14.   At the court's request, defendant and the State later stipulated to the following additional facts for purposes of the motion to dismiss: complainant sent the photographs to Mr. Coon on October 7, 2015.  The photographs were posted on a public Facebook page on October 8, 2015.  Complainant was not in a relationship with Mr. Coon at the time the photographs were

---

[5]  Defendant raised several other claims in her motion to dismiss, including that the law violated the Vermont Constitution and that the statute was overbroad.  The trial court rejected these claims as inadequately briefed.

6

sent to him. Defendant did not have permission to access Mr. Coon's Facebook account. Mr. Coon believed that defendant accessed his Facebook account through her telephone, which had Mr. Coon's password saved.

¶ 15. Within this factual context, the trial court considered defendant's facial challenge to 13 V.S.A. § 2606 under the First Amendment. The court concluded that § 2606 imposed a content-based restriction on protected speech, which required the State to show that the law is "narrowly tailored to promote a compelling Government interest," and there is no "less restrictive alternative" available that would serve the Government's purpose. United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 813 (2000); see also Williams-Yulee v. Fla. Bar, __ U.S. __, 135 S. Ct. 1656, 1665-66 (2015) (explaining State bears burden of showing statute survives strict scrutiny). Assuming that a compelling governmental interest existed, the court concluded that the State failed to show that there were no less restrictive alternatives available, or to address why civil penalties, such as those set out in 13 V.S.A. § 2606(e), were not reasonable and effective alternatives. It thus concluded the statute did not survive strict scrutiny and dismissed the State's charges.

¶ 16. The court did not address defendant's assertion that complainant had no reasonable expectation of privacy in her nude photographs under 13 V.S.A. § 2606(d)(1). It did note, however, that the facts of this case were not a clear example of the "typical revenge porn case" because complainant sent the photographs to a person with whom she had a past but not present relationship. The court noted that complainant would not have known Mr. Coon's relationship status, the effect that such photographs might have on that relationship, or who might have access to his Facebook account.

¶ 17. The State challenges the court's dismissal of its charges through a petition for extraordinary relief requesting that we review the trial court's ruling that § 2606 is unconstitutional.[6]

## IV. Facial Validity of Section 2606

¶ 18. On appeal, the only issue the parties have briefed is the facial challenge to § 2606. First, the State argues that nonconsensual pornography, as defined in the Vermont statute, falls outside of the realm of constitutionally protected speech for two reasons: such speech amounts to obscenity, and it constitutes an extreme invasion of privacy unprotected by the First Amendment. Second, the State argues that even if nonconsensual pornography falls outside of the categorical exclusions to the First Amendment's protection of free speech, the statute is narrowly tailored to further a compelling State interest. Defendant counters each of these points.

¶ 19. The facial constitutionality of a statute presents a pure question of law that we review without deference to the trial court. State v. Tracy, 2015 VT 111, ¶ 14, 200 Vt. 216, 130 A.3d 196. To succeed in a typical facial attack, defendant would have to establish "that no set of circumstances exists under which [§ 2606] would be valid," or that the statute lacks any "plainly legitimate sweep." United States v. Stevens, 559 U.S. 460, 472 (2010) (quotations omitted). The Supreme Court has recognized that in a facial challenge to a regulation of speech based on overbreadth, a law may be invalidated if "a substantial number of its applications are

---

[6] Under 13 V.S.A. § 7403(a), in a misdemeanor prosecution, the superior court may pass questions of law to the Supreme Court "before final judgment." Pursuant to V.R.A.P. 5, upon motion for permission to appeal by the State, the trial court must allow the State to appeal from a pretrial ruling on a question of law if the court finds that the ruling involves a controlling question of law and there exists a substantial ground for difference of opinion, and an immediate appeal may materially advance the termination of the litigation. V.R.A.P. 5(b)(1)(A), (B), (b)(3). The superior court issued its ruling dismissing the State's charges on July 1, 2016, and the State filed a motion for permission to appeal on July 5. When the State filed its motion, it had not received notice that the superior court had already entered final judgment. The trial court granted the State's motion to appeal, but because that court had already entered a final judgment, the State notes that it appears that the superior court lacked authority to grant permission to appeal. Id. 7403(a). Because it had no adequate remedy by appeal or through proceedings for extraordinary relief in the superior court, the State sought review of the trial court's ruling through extraordinary relief. V.R.A.P. § 21.

8

unconstitutional, judged in relation to the statute's plainly legitimate sweep." Id. at 473 (quotation omitted). Defendant here does not frame his challenge to the statute as an overbreadth challenge but instead argues that insofar as the speech restricted by the statute is content-based, the statute is presumptively invalid and fails strict scrutiny review. Although we focus our analysis on whether the statute has a "plainly legitimate sweep," our analysis does not ultimately turn on which standard of review we apply to this facial challenge.

¶ 20.　The First Amendment to the U.S. Constitution, applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I; Thornhill v. Alabama, 310 U.S. 88, 95 (1940). This protection applies to expression without regard "to the truth, popularity, or social utility of the ideas and beliefs which are offered." Nat'l Ass'n for Advancement of Colored People v. Button, 371 U.S. 415, 444-45 (1963). For that reason, "[c]ontent-based regulations are presumptively invalid." R.A.V. v. City of St. Paul, 505 U.S. 377, 382 (1992).

¶ 21.　The protections of the First Amendment are not, however, absolute. The U.S. Supreme Court has "long recognized that the government may regulate certain categories of expression consistent with the Constitution." Virginia v. Black, 538 U.S. 343, 358 (2003). These well-defined and narrow categories of expression have "such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." Id. at 358-59 (quoting R.A.V., 505 U.S. at 382-83). Among the speech categorically subject to some content-based restrictions are advocacy directed to and likely to incite imminent lawless action, Brandenburg v. Ohio, 395 U.S. 444, 447 (1969) (per curium); true threats, Watts v. United States, 394 U.S. 705, 708 (1969) (per curium); obscenity, Roth v. United States, 354 U.S. 476, 483 (1957); and child pornography, New York v. Ferber, 458 U.S. 747, 763-64 (1982). Those regulations directed at other speech that is not categorically excluded from the broad protection of the First Amendment may stand only if they are narrowly tailored to serve a compelling government interest. R.A.V., 505 U.S. at 395.

9

¶ 22.    For the reasons set forth below, we conclude that "revenge porn" does not fall within an established categorical exception to full First Amendment protection, and we decline to predict that the U.S. Supreme Court would recognize a new category.  However, we conclude that the Vermont statute survives strict scrutiny as the U.S. Supreme Court has applied that standard.

## A.  Categorical Exclusions

### 1.  Obscenity

¶ 23.    Although some nonconsensual pornography may meet the constitutional definition of obscenity, we reject the State's contention that the Vermont statute categorically regulates obscenity and is thus permissible under the First Amendment.  The purposes underlying government regulation of obscenity and of nonconsensual pornography are distinct, the defining characteristics of the regulated speech are accordingly quite different, and we are mindful of the U.S. Supreme Court's recent rejection of efforts to expand the definition of obscenity to include new types of speech that may engender some of the harms of obscenity.

¶ 24.    The Supreme Court has recognized the government's "legitimate interest in prohibiting dissemination or exhibition of obscene material when the mode of dissemination carries with it a significant danger of offending the sensibilities of unwilling recipients or of exposure to juveniles."  Miller v. California, 413 U.S. 15, 18-19 (1973) (footnote omitted).  The Court has consistently recognized that a state's interest in regulating obscenity relates to protecting the sensibilities of those exposed to obscene works, as opposed to, for example, protecting the privacy or integrity of the models or actors depicted in obscene images.  See, e.g., Ferber, 458 U.S. at 756 ("The Miller standard, like its predecessors, was an accommodation between the State's interests in protecting the 'sensibilities of unwilling recipients' from exposure to pornographic material and the dangers of censorship inherent in unabashedly content-based laws.").

¶ 25.    By contrast, a state's interest in regulating nonconsensual pornography has little to do with the sensibilities of the people exposed to the offending images; the State interest in this case focuses on protecting the privacy, safety, and integrity of the victim subject to nonconsensual

10

public dissemination of highly private images. In that sense, Vermont's statute is more analogous to the restrictions on child pornography that the Supreme Court has likewise categorically excluded from full First Amendment protection. See id. 756-59 (recognizing that restrictions on distributing child pornography that is not otherwise obscene serve State's compelling interest in preventing sexual exploitation and abuse of children by, among other things, protecting children from harm flowing from circulation of images).

¶ 26. Given these disparate interests, the test for obscenity that may be regulated consistent with the First Amendment is different from that for nonconsensual pornography under the Vermont statute. In considering whether expression is obscene for the purposes of the categorical exclusion from the full protections of the First Amendment, a trier of fact must consider:

> (a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political or scientific value.

Miller, 413 U.S. at 24 (quotation and citations omitted). The offending disclosures pursuant to Vermont's statute, by contrast, need not appeal to the prurient interest or be patently offensive. Typically, their purpose is to shame the subject, not arouse the viewer. See 13 V.S.A. § 2606(b)(1) (disclosure is prohibited if undertaken with intent to "harm, harass, intimidate, threaten, or coerce the person depicted"). Although, by definition, the nonconsensual pornography must include images of genitals, the pubic area, anus, or female nipple, or depictions of sexual conduct as defined in 13 V.S.A. §§ 2606(a)(3)-(4), 2821, those depictions need not appeal to the prurient interest applying contemporary community standards or be patently offensive in and of themselves. We agree with the State's assertion that the privacy invasion and violation of the consent of the person depicted in revenge porn are offensive, but the viewer of the images need not know that they were disseminated without the consent of the person depicted in order to satisfy

11

the revenge porn statute. Although the context in which images are disseminated may inform the obscenity analysis, the circumstances of their procurement and distribution fall outside of the typical obscenity assessment. For these reasons, the category of obscenity is ill-suited to include the nonconsensual pornography regulated here.

¶ 27. We recognize that some of the characteristics of obscenity that warrant its regulation also characterize nonconsensual pornography, but we take our cues from the Supreme Court's reluctance to expand the scope of obscenity on the basis of a purpose-based analysis. Although images constituting nonconsensual pornography need not meet the constitutional standard for obscenity, they do, by definition, involve portrayals of sexual conduct or images of intimate sexual organs. In addition, the types of images at issue here have not historically enjoyed First Amendment protection. See Stevens, 559 U.S. at 469-72 (rooting constitutional analysis in part in historical protections, or absence of protections, for particular category of speech). However, the Supreme Court has recently expressed its reluctance to expand the category of obscenity to sweep in content not previously included within that category. See Brown, 564 U.S. at 792-94 (rejecting suggestion that violent video games can be included within category of obscenity because violence is distinct from obscenity that Constitution permits to be regulated). The Court characterized the State as attempting "to shoehorn speech about violence into obscenity," when the regulated video games were not obscene as to youth nor subject to some other legitimate proscription. Id. at 793-95.

¶ 28. Given the ill fit between nonconsensual pornography and obscenity, and the Supreme Court's reluctance to expand the contours of the category of obscenity, we conclude that the speech restricted by Vermont's statute cannot be fairly categorized as constitutionally unprotected obscenity.

### 2. Extreme Invasion of Privacy

¶ 29. Although many of the State's arguments support the proposition that the speech at issue in this case does not enjoy full First Amendment protection, we decline to identify a new

categorical exclusion from the full protections of the First Amendment when the Supreme Court has not yet addressed the question.

¶ 30.    The Supreme Court recognized in Stevens that there may be "some categories of speech that have been historically unprotected, but have not yet been specifically identified or discussed as such in our case law." 559 U.S. at 472.    In deciding whether to recognize a new category outside the First Amendment's full protections for depictions of animal cruelty, the Court focused particularly on the absence of any history of regulating such depictions, rather than the policy arguments for and against embracing the proposed new category.    Id. at 469; see also Williams-Yulee, __ U.S. at __, 135 S. Ct. at 1666-67 ("[A] history and tradition of regulation are important factors in determining whether to recognize new categories of unprotected speech." (quotation omitted)); United States v. Alvarez, 567 U.S. 709, 722 (2012) ("Before exempting a category of speech from the normal prohibition on content-based restrictions, . . . the Court must be presented with persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription.").

¶ 31.    The State makes a persuasive case that United States legal history supports the notion that states can regulate expression that invades individual privacy without running afoul of the First Amendment.    It points to a host of statements by the Supreme Court over the years suggesting that the government may regulate speech about purely private matters that implicates privacy and reputational interests, an influential 1890 law review article by Samuel Warren and Louis Brandeis recognizing the right to privacy, and a well-established common law tort of publicity given to private life.    The State's arguments in this regard are well-founded.

¶ 32.    The Supreme Court has never struck down a restriction of speech on purely private matters that protected an individual who is not a public figure from an invasion of privacy or similar harms; to the contrary, the Court has repeatedly reconciled the tension between the right to privacy and freedom of expression with an analysis of the specific privacy claims and the public interest in the communications at issue, rather than a broad ruling prioritizing one of these values

13

over another. For example, in Time Inc. v. Hill, the Court considered a civil judgment against Life Magazine based on allegations that the magazine falsely reported that a play about three convicts holding a family hostage depicted the actual experiences of plaintiffs' family. 385 U.S. 374, 376-77 (1967). The Court concluded that the First Amendment precluded applying state law to redress false reports of matters of public interest absent "proof that the defendant published the report with knowledge of its falsity or in reckless disregard of the truth." Id. at 387-88. Of significance here, the Court expressly noted that the case presented "no question whether truthful publication of [revelations that are so intimate and unwarranted in view of the victim's position as to outrage the community's notions of decency] could be constitutionally proscribed." Id. at 383 n.7.[7]

¶ 33.    Subsequently, in Cox Broadcasting Corp. v. Cohn, the Court again declined to hold that the First Amendment overrides state regulation of speech about purely private matters that invades the privacy of nonpublic individuals. 420 U.S. 469, 495-97 (1975) (striking as unconstitutional civil damages award against television station that broadcast name of rape-murder victim station had obtained from courthouse records). The Court noted its reservation of the question in Time, Inc., and explained,

> In this sphere of collision between claims of privacy and those of the free press, the interests on both sides are plainly rooted in the traditions and significant concerns of our society. Rather than address the broader question whether truthful publications may ever be subjected to civil or criminal liability consistently with the First and Fourteenth Amendments, or to put it another way, whether the State may ever define and protect an area of privacy free from unwanted publicity in the press, it is appropriate to focus on the narrower interface between press and privacy that this case presents, namely, whether the State may impose sanctions on the accurate publication of the name of a rape victim obtained from . . . judicial records which are . . . open to public inspection.

---

[7] See also Garrison v. State of La., 379 U.S. 64, 72 n.8 (1964) ("We recognize that different interests may be involved where purely private libels, totally unrelated to public affairs, are concerned; therefore, nothing we say today is to be taken as intimating any views as to the impact of the constitutional guarantees in the discrete area of purely private libels.").

Id. at 491. In concluding that it could not, the Court relied heavily on the importance of the news media in fully and accurately reporting government proceedings, including the administration of justice; the legitimate public interest in judicial proceedings arising from criminal prosecutions; the open and public nature of a trial; the common law exception to a tort action for invasion of privacy when a defendant merely gives further publicity to information about a plaintiff that is already a matter of public record; and the fact that the information at issue was already in the public domain in official court records. Id. at 491-96. The Court emphasized that "[t]he freedom of the press to publish that information appears to us to be of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business," held that states may not impose sanctions on the publication of truthful information contained in official court records open to public inspections, and noted the peril of a contrary course that would make public records generally available to the media but forbid their publication at the same time. Id. at 495-96. What is most significant for our purposes today is that the Court declined to adopt a broad rule striking down limits on truthful publications that invade individuals' privacy, and instead relied very heavily in its analysis on the role of the free press, the significance of the information at issue for effective democracy, and the fact that the information was part of the public record prior to the allegedly offending publication.

¶ 34. More recently, in The Florida Star v. B.J.F., the Court considered a civil judgment against a Florida newspaper for publishing the name of a rape victim that it had obtained from a publicly released police report in violation of a Florida statute. 491 U.S. 524 (1989). The Court emphatically declined to adopt an across-the-board rule that a truthful publication may never be punished consistent with the First Amendment, instead reaffirming that "the sensitivity and significance of the interests presented in clashes between First Amendment and privacy rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case." Id. at 532-33. The Court concluded, "if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally

15

punish publication of the information, absent a need to further a state interest of the highest order." Id. at 533 (alteration and quotation omitted). It relied on three considerations to support its holding: first, where the government possesses the information at issue, it can take steps to safeguard the privacy interests it seeks to protect; second, punishing the press for disseminating information that is already publicly available is unlikely to advance the interests the government seeks to protect; and third, allowing the media to be punished for publishing certain truthful information may lead to "timidity and self-censorship." Id. at 534-36 (quotation omitted).

¶ 35. Concluding that the defendant had lawfully acquired the name of the rape victim, the Court held that the State did not have a sufficiently overriding interest to warrant imposing liability on the defendant. Id. at 537. The Court acknowledged that the State's interests were considerable, but concluded that where the government had itself provided the information, punishing the defendant for publishing it would be especially likely to lead to self-censorship, id. at 538; the breadth of the statute allowed for liability without any finding of scienter or that the disclosure would be highly offensive to a reasonable person, id. at 539; and the statute's limitation to dissemination through an "instrument of mass communication" was underinclusive with respect to the State's goals. Id. at 540. The Court emphasized the limitations of its holding: "We do not hold that truthful publication is automatically constitutionally protected, or that there is no zone of personal privacy within which the State may protect the individual from intrusion by the press, or even that a State may never punish publication of the name of a victim of a sexual offense." Id. at 541.

¶ 36. The Court again considered the clash between privacy rights and the First Amendment's protections for free speech in a case in which a radio commentator played a tape of an illegally intercepted telephone conversation between the president of a local teachers' union and the union's chief negotiator during a contentious labor negotiation. Bartnicki v. Vopper, 532 U.S. 514 (2001). The plaintiffs' damage claims against the radio commentator were based in part on the federal Wiretapping and Electronic Surveillance statute. 18 U.S.C. § 2511. The question

was whether that statute could support a civil judgment against the radio commentator consistent with the First Amendment. The Court emphasized three facts as critical to its analysis: the radio commentator had not himself played any role in the illegal interception; he had obtained tapes of the conversation lawfully, even though the information was unlawfully intercepted by someone else; and the subject matter of the conversation was a matter of public concern. Bartnicki, 532 U.S. at 525. The Court again insisted on defining the issue narrowly, emphasizing that "the interests presented in clashes between [the] First Amendment and privacy rights counsel relying on limited principles that sweep no more broadly than the appropriate context in the instant case." Id. at 529 (quotation omitted).

¶ 37. The Court acknowledged the government's interest in "encouraging the uninhibited exchange of ideas and information among private parties" by protecting the privacy of communications. Id. at 532-33 (quotation omitted). It recognized that "some intrusions on privacy are more offensive than others, and that the disclosure of the contents of a private conversation can be an even greater intrusion on privacy than the interception itself." Id. at 533. The Court expressly reserved the question of whether the government's interest in protecting privacy is strong enough to justify application of the statute "to disclosures of trade secrets or domestic gossip or other information of purely private concern." Id. Because the intercepted communications concerned matters of public importance, and the radio commentator played no part in unlawfully intercepting them, the Court concluded that the First Amendment shielded the commentator from penalty for publishing the tapes. Id. at 535.

¶ 38. These U.S. Supreme Court decisions reflect three consistent themes: (1) speech on matters of private concern that implicate the privacy interests of nonpublic figures does not enjoy the same degree of First Amendment protection as speech on matters of public concern or relating to public figures; (2) state laws protecting individual privacy rights have long been established, and are not necessarily subordinate to the First Amendment's free speech protections; and (3) the

17

Court is wary of broad rules or categorical holdings framing the relationship between laws protecting individual privacy and the First Amendment.

¶ 39.    Two other related sources relied upon by the State, an influential law review article from 1890 and the Restatement (Second) of Torts, reinforce the second of these points—that the notion that the government may protect individual privacy interests without running afoul of the First Amendment has a well-established history in U.S. law.  The law review article by Samuel D. Warren and Louis D. Brandeis (before he was appointed to the Supreme Court) argued for the development of an invasion of privacy tort as early as 1890.  The Right to Privacy, 4 Harv. L. Rev. 193 (1890).  Reviewing various evolutions in the common law, the authors described one of the problems they sought to address:

> Recent inventions and business methods call attention to the next step which must be taken for the protection of the person, and for securing to the individual what Judge Cooley calls the right "to be let alone." Instantaneous photographs and newspaper enterprise have invaded the sacred precincts of private and domestic life; and numerous mechanical devices threaten to make good the prediction that what is whispered in the closet shall be proclaimed from the house-tops. For years there has been a feeling that the law must afford some remedy for the unauthorized circulation of portraits of private persons . . . .

Id. at 195 (footnote omitted) (quotation omitted).

¶ 40.    Reviewing existing common law principles and cases, the authors concluded that existing causes of action, such as breach of trust or property-based claims, had long been used to protect privacy interests but were inadequate to fully meet that need in a changing world—where, among other things, "the latest advances in photographic art have rendered it possible to take pictures surreptitiously."  Id. at 211.  They proposed to expressly recognize that the invasion of privacy is itself a legal injury giving rise to a right to redress,[8] id. at 213, and argued:

> The right of one who has remained a private individual, to prevent his public portraiture, presents the simplest case for such extension;

---

[8] The authors proposed a tort action for damages and the possibility of injunctive relief in certain cases.  Id. at 219.  They also argued for criminal liability but acknowledged that that would require legislation.  Id.

18

> the right to protect one's self from pen portraiture, from a discussion by the press of one's private affairs, would be a more important and far-reaching one. If casual and unimportant statements in a letter, if handiwork, however inartistic and valueless, if possessions of all sorts are protected not only against reproduction, but against description and enumeration, how much more should the acts and sayings of a man in his social and domestic relations be guarded from ruthless publicity. If you may not reproduce a woman's face photographically without her consent, how much less should be tolerated the reproduction of her face, her form, and her actions, by graphic descriptions colored to suit a gross and depraved imagination.

Id. at 213-14.

¶ 41. The authors elaborated on the right to privacy and its limits. They explained that the right to privacy does not prohibit publication regarding matters of public interest, emphasizing that the purpose of the law should be to protect people "with whose affairs the community has no legitimate concern, from being dragged into an undesirable and undesired publicity and to protect all persons, whatsoever, their position or station, from having matters which they may properly prefer to keep private, made public against their will." Id. at 214-15. Accordingly, the authors recognized that, for example, "[p]eculiarities of manner and person, which in the ordinary individual should be free from comment, may acquire a public importance, if found in a candidate for political office," and publishing that a "modest and retiring individual" has a speech impediment or cannot spell may be an unwarranted infringement, but commenting on the same characteristics in a candidate for Congress would not be improper. Id. at 215. They noted that the right to privacy does not prohibit communications that are privileged for purposes of defamation laws, id. at 216; that the right to privacy ceases upon the individual's consent to publication of the facts at issue, id. at 218; and that neither truth nor the absence of "malice" are defenses to invasions of privacy. Id.

¶ 42. We describe this article in detail because it is frequently cited as a critical catalyst to the development of right-to-privacy law in this country. See, e.g., Restatement (Second) of Torts § 652A, cmt. a. Several distinct causes of action have arisen to protect the interests of an

19

individual in leading, to a reasonable extent, "a secluded and private life, free from the prying eyes, ears and publications of others." Id. cmt. b. Most pertinent to the case at hand is the cause of action for "publicity given to private life." Id. § 652D. In particular, the Restatement explains, "One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of . . . privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." Id. The Restatement acknowledges that the relationship between § 652D and the First Amendment is not clear. The tort has been widely adopted, including in Vermont. See Lemnah v. Am. Breeders Serv., Inc., 144 Vt. 568, 574, 482 A.2d 700, 704 (1984).

¶ 43. The broad development across the country of invasion of privacy torts, and the longstanding historical pedigree of laws protecting the privacy of nonpublic figures with respect to matters of only private interest without any established First Amendment limitations, distinguish the kinds of privacy-protecting laws at issue here from the law prohibiting depictions of animal cruelty at issue in Stevens, 559 U.S. at 460. In that respect, nonconsensual pornography seems to be a strong candidate for categorical exclusion from full First Amendment protections.

¶ 44. Notwithstanding these considerations, we decline to predict that the Supreme Court will add nonconsensual pornography to the list of speech categorically excluded. We base our declination on two primary considerations: the Court's recent emphatic rejection of attempts to name previously unrecognized categories, and the oft-repeated reluctance of the Supreme Court to adopt broad rules dealing with state regulations protecting individual privacy as they relate to free speech.

¶ 45. More than once in recent years, the Supreme Court has rebuffed efforts to name new categories of unprotected speech. In Stevens, the Court emphatically refused to add "depictions of animal cruelty" to the list, rejecting the notion that the court has "freewheeling authority to declare new categories of speech outside the scope of the First Amendment." 559 U.S. at 472. The Court explained, "Maybe there are some categories of speech that have been

historically unprotected, but have not yet been specifically identified or discussed as such in our case law. But if so, there is no evidence that 'depictions of animal cruelty' is among them." Id. A year later, citing Stevens, the Court declined to except violent video games sold to minors from the full protections of the First Amendment. Brown, 564 U.S. at 790-93 ("[N]ew categories of unprotected speech may not be added to the list by a legislature that concludes certain speech is too harmful to be tolerated."). And a year after that, the Court declined to add false statements to the list. Alvarez, 567 U.S. at 722 (affirming appeals court ruling striking conviction for false statements about military decorations).

¶ 46.   More significantly, as set forth more extensively above, see supra, ¶¶ 32-38, in case after case involving a potential clash between the government's interest in protecting individual privacy and the First Amendment's free speech protections, the Supreme Court has consistently avoided broad pronouncements, and has defined the issue at hand narrowly, generally reconciling the tension in favor of free speech in the context of speech about matters of public interest while expressly reserving judgment on the proper balance in cases where the speech involves purely private matters. The considerations that would support the Court's articulation of a categorical exclusion in this case may carry great weight in the strict scrutiny analysis, see supra, ¶¶ 47-67, below. But we leave it to the Supreme Court in the first instance to designate nonconsensual pornography as a new category of speech that falls outside the First Amendment's full protections.

B.  Strict Scrutiny

¶ 47.   Our conclusion that nonconsensual pornography does not fall into an existing or new category of unprotected speech does not end the inquiry. The critical question is whether the First Amendment permits the regulation at issue. See, e.g., Williams-Yulee, __ U.S. at __, 135 S. Ct. at 1667-73 (acknowledging solicitation of campaign funds by judicial candidates is not category of unprotected speech under the First Amendment, but concluding restriction on such solicitations was constitutionally permitted because it was narrowly tailored to serve compelling

21

State interest). The remaining question is whether § 2606 is narrowly tailored to serve a compelling State interest.

### 1. Compelling Interest

¶ 48. We conclude that the State interest underlying § 2606 is compelling. We base this conclusion on the U.S. Supreme Court's recognition of the relatively low constitutional significance of speech relating to purely private matters, evidence of potentially severe harm to individuals arising from nonconsensual publication of intimate depictions of them, and a litany of analogous restrictions on speech that are generally viewed as uncontroversial and fully consistent with the First Amendment.

¶ 49. Although we decline to identify a new category of unprotected speech on the basis of the above cases, the decisions cited above are relevant to the compelling interest analysis in that they reinforce that the First Amendment limitations on the regulation of speech concerning matters of public interest do not necessarily apply to regulation of speech concerning purely private matters. Time and again, the Supreme Court has recognized that speech concerning purely private matters does not carry as much weight in the strict scrutiny analysis as speech concerning matters of public concern, and may accordingly be subject to more expansive regulation.[9]

¶ 50. In Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., a majority of Supreme Court justices concluded that the "recovery of presumed and punitive damages in defamation cases absent a showing of 'actual malice' does not violate the First Amendment when the defamatory

---

[9] The State argues that on account of the Court's statements concerning speech relating to matters of only private concern, we should apply intermediate scrutiny in evaluating this regulation. See Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 662 (1994) (explaining that intermediate scrutiny requires substantial government interest and that means chosen to advance that interest do not burden substantially more speech than necessary to advance that interest). Because the Supreme Court has not expressly adopted an intermediate scrutiny framework for evaluating content-based restrictions that apply to low-value, purely private speech, we decline to do so here. However, as a practical matter, in light of the Court's statements about the relatively lower constitutional value ascribed to such speech, application of strict scrutiny to restrictions on nonconsensual pornography may not look significantly different than an intermediate scrutiny analysis.

22

statements do not involve matters of public concern." 472 U.S. 749, 762 (1985); id. at 763-64 (Burger, C.J., concurring); id. at 765-774 (White, J., concurring). The plurality explained that the Court's conclusion in New York Times Co. v. Sullivan, 376 U.S. 254 (1964), that the First Amendment limits the reach of state defamation laws was based on the Constitution's solicitude for "freedom of expression upon public questions" and the view that "debate on public issues should be uninhibited, robust, and wide open." Dun & Bradstreet, Inc., 472 U.S. at 755 (quotation omitted). The Court elaborated:

> The First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people. Speech concerning public affairs is more than self-expression; it is the essence of self-government. Accordingly, the Court has frequently affirmed that speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection. In contrast, speech on matters of purely private concern is of less First Amendment concern. As a number of state courts, including the court below, have recognized, the role of the Constitution in regulating state libel law is far more limited when the concerns that activated New York Times and Gertz are absent.

Id. at 759 (alternations, citations, and quotations omitted).

¶ 51.    The Court echoed these sentiments more recently and built on this analysis in Snyder v. Phelps, 562 U.S. 443 (2011). In Snyder, the Westboro Baptist Church picketed on public land approximately 1,000 feet from a funeral service for a soldier killed in Iraq. The picketers displayed signs stating, among other things, "Thank God for Dead Soldiers," "God Hates You," and "Fags Doom Nations." Id. at 454. The soldier's father could see the tops of the picket signs as he drove to the funeral, although he did not see what was written on them until watching a news broadcast later that night. He sued the church and its leaders (collectively "Westboro") for various torts, and a jury awarded him five million dollars in compensatory and punitive damages for intentional infliction of emotional distress, intrusion upon seclusion, and civil conspiracy.

¶ 52.    The Court affirmed the appeals court's reversal and judgment for defendants on the basis that the speech was protected by the First Amendment. In reaching its conclusion, the Court

23

explained, "Whether the First Amendment prohibits holding Westboro liable for its speech in this case turns largely on whether that speech is of public or private concern, as determined by all the circumstances of the case." Id. at 451. After recounting the myriad reasons why speech concerning matters of public concern is "at the heart of the First Amendment's protection," id. at 451-52, the Court considered the status of speech concerning purely private matters:

> Not all speech is of equal First Amendment importance, however, and where matters of purely private significance are at issue, First Amendment protections are often less rigorous. That is because restricting speech on purely private matters does not implicate the same constitutional concerns as limiting speech on matters of public interest. There is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas; and the threat of liability does not pose the risk of a reaction of self-censorship on matters of public import.

Id. at 452 (alternations, citations, and quotations omitted).

¶ 53.    The Court acknowledged that "the boundaries of the public concern test are not well defined," and offered the following guiding principles:

> Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public. The arguably inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.

Id. at 453 (citations and quotations omitted).

¶ 54.    Considering the content (though not the viewpoint) of the picketers' signs in context, the Court concluded that the messages plainly related to "broad issues of interest to society at large," rather than matters of "purely private concern." Id. at 454 (quotation omitted). The signs conveyed Westboro's views concerning "the political and moral conduct of the United States and its citizens, the fate of our Nation, homosexuality in the military, and scandals involving the Catholic clergy"—all "matters of public import." Id. The signs conveyed the church's position on these issues in a manner designed "to reach as broad a public audience as possible." Id. Because

24

"Westboro's speech was at a public place on a matter of public concern," it was "entitled to 'special protection' under the First Amendment," which could not "be overcome by a jury finding that the picketing was outrageous." Id. at 458. The Court therefore set aside the jury verdict that imposed tort liability on Westboro for intentional infliction of emotional distress.

¶ 55. The proscribed speech in this case has no connection to matters of public concern. By definition, the proscribed images must depict nudity or sexual conduct, § 2606(b)(1); must be disseminated without the consent of the victim, id.; cannot include images in settings in which a person does not have a reasonable expectation of privacy, id. § 2606(d)(1); cannot include disclosures made in the public interest, including reporting concerning various specified matters, id. § 2606(d)(2); and may not constitute a matter of public concern, id. § 2606(d)(3). By definition, the speech subject to regulation under § 2606 involves the most private of matters, with the least possible relationship to matters of public concern.

¶ 56. Moreover, nonconsensual pornography is remarkably common, and the injuries it inflicts are substantial. A 2014 estimate set the number of websites featuring nonconsensual pornography at 3,000. Revenge Porn: Misery Merchants, The Economist (July 5, 2014), http://www.economist.com/news/international/21606307-how-should-online-publication-explicit-images-without-their-subjects-consent-be [https://perma.cc/93MV-KNWL]. That number has no doubt grown. One recent survey found that that two percent of U.S. internet users have been the victim of nonconsensual pornography—that is, someone actually posted an explicit video or image of them online without their consent. A. Lenhart, M. Ybarra, M. Price-Feeney, Data & Society Research Institute and Center for Innovative Public Health Research, Nonconsensual Image Sharing: One in 25 Americans Has Been a Victim of "Revenge Porn," 4 (Dec. 13, 2016), https://datasociety.net/pubs/oh/Nonconsensual_Image_Sharing_2016.pdf [https://perma.cc/3995-QXAH]. A survey of victims of nonconsensual pornography found that in over fifty percent of the cases the nude images were published alongside the victim's full name and social network

profile, and over twenty percent of victims reported that their email addresses and telephone numbers appeared alongside the images.  D. Citron & M. Franks, supra, at 350-51.

¶ 57.    The harm to the victims of nonconsensual pornography can be substantial.  Images and videos can be directly disseminated to the victim's friends, family, and employers; posted and "tagged" (as in this case) so they are particularly visible to members of a victim's own community; and posted with identifying information such that they catapult to the top of the results of an online search of an individual's name.  In the constellation of privacy interests, it is difficult to imagine something more private than images depicting an individual engaging in sexual conduct, or of a person's genitals, anus, or pubic area, that the person has not consented to sharing publicly.  The personal consequences of such profound personal violation and humiliation generally include, at a minimum, extreme emotional distress.  See id. at 351 (citing data that over eighty percent of victims report severe emotional distress and anxiety).  Amici cited numerous instances in which the violation led the victim to suicide.  Moreover, the posted images can lead employers to fire victims.  See, e.g., Warren City Bd. of Educ., 124 Lab. Arb. Rep. (BNA) 532, 536-37 (2007) (arbitration decision upholding termination of teacher fired after ex-spouse distributed nude images online and in community).  A Microsoft-commissioned survey found that an internet search is a standard part of most employers' hiring processes.  Cross-tab, Online Reputation in a Connected World, 6 (2010) https://www.job-hunt.org/guides/DPD_Online-Reputation-Research_overview.pdf [https://perma.cc/QGV2-A9JX].  For that reason, nonconsensual pornography posted online can be a significant obstacle to getting a job.  Moreover, the widespread dissemination of these images can lead to harassment, extortion, unwelcome sexual attention, and threats of violence.  See D. Citron & M. Franks, supra, at 350-54.  The government's interest in preventing any intrusions on individual privacy is substantial; it's at its highest when the invasion of privacy takes the form of nonconsensual pornography.

¶ 58.    Finally, the government's interest in preventing the nonconsensual disclosure of nude or sexual images of a person obtained in the context of a confidential relationship is at least

26

as strong as its interest in preventing the disclosure of information concerning that person's health or finances obtained in the context of a confidential relationship; content-based restrictions on speech to prevent these other disclosures are uncontroversial and widely accepted as consistent with the First Amendment. Doctors who disclose individually identifiable health information without permission may be subject to a $50,000 fine and a term of imprisonment for up to a year. 42 U.S.C. § 1320d-6. Banks are prohibited from disclosing to third-parties nonpublic, personal information about their customers without first giving the customers a chance to "opt out." 15 U.S.C. § 6802(b). In fact, in Vermont financial institutions can only make such disclosures if customers "opt in." Reg. B-2018-01: Privacy of Consumer Financial and Health Information § 11, Code of Vt. Rules 21 010 016, http://www.lexisnexis.com/hottopics/codeofvtrules. A violation of this requirement is subject to a fine of up to $15,000. Id. § 24; 8 V.S.A. § 10205; 8 V.S.A. § 11601(a)(4). And nonconsensual disclosure of individuals' social security numbers in violation of U.S. law can subject the discloser to fines and imprisonment for up to five years. 42 U.S.C. § 408(a)(8). In these cases, it is obvious that the harm to be addressed flows from the disclosure of personal information. The fact that the disclosure requires speech, and that restriction of that speech is based squarely on its content, does not undermine the government's compelling interest in preventing such disclosures. From a constitutional perspective, it is hard to see a distinction between laws prohibiting nonconsensual disclosure of personal information comprising images of nudity and sexual conduct and those prohibiting disclosure of other categories of nonpublic personal information. The government's interest in protecting all from disclosure is strong.

¶ 59. For the above reasons, we conclude that the State interest underlying § 2606 is compelling. Accord People v. Iniguez, 202 Cal. Rptr. 3d 237, 243 (App. Dep't Super. Ct. 2016) ("It is evident that barring persons from intentionally causing others serious emotional distress through the distribution of photos of their intimate body parts is a compelling need of society.").

27

## 2. Narrowly Tailored

¶ 60.    Section 2606 defines unlawful nonconsensual pornography narrowly, including limiting it to a confined class of content, a rigorous intent element that encompasses the nonconsent requirement, an objective requirement that the disclosure would cause a reasonable person harm, an express exclusion of images warranting greater constitutional protection, and a limitation to only those images that support the State's compelling interest because their disclosure would violate a reasonable expectation of privacy.    Our conclusion on this point is bolstered by a narrowing interpretation of one provision that we offer to ensure that the statute is duly narrowly tailored.    The fact that the statute provides for criminal as well as civil liability does not render it inadequately tailored.

¶ 61.    The images subject to § 2606 are precisely defined, with little gray area or risk of sweeping in constitutionally protected speech.    Nude images are defined as those showing genitalia, the pubic area, anus, or post-pubescent female nipple.    13 V.S.A. § 2606(a)(3).    Sexual conduct involves contact between the mouth and penis, anus or vulva, or between two of the latter three; intrusion by any part of a person's body or object into the genital or anal opening of another with the intent to appeal to sexual desire; intentional touching (not through the clothing) of the genitals, anus or breasts of another with the intent of appealing to sexual desire, masturbation, bestiality, or sadomasochistic abuse for sexual purposes.    See id. § 2606(a)(4); id. § 2821.    The individual depicted in the image must be identifiable.    Id. § 2606(b)(1).

¶ 62.    Moreover, disclosure is only criminal if the discloser <u>knowingly</u> discloses the images without the victim's consent.    Id.    We construe this intent requirement to require knowledge of both the fact of disclosing, and the fact of nonconsent.    See <u>State v. Richland</u>, 2015 VT 126, ¶¶ 9-11, 200 Vt. 401, 132 A.3d 702 (discussing presumption that statutory state-of-mind requirement applies to all elements of offense).    Individuals are highly unlikely to accidentally violate this statute while engaging in otherwise permitted speech.    In fact, § 2606 goes further, requiring not only knowledge of the above elements, but a specific intent to harm, harass,

28

intimidate, threaten, or coerce the person depicted or to profit financially. 13 V.S.A. § 2606(b)(1), (2).[10]

¶ 63.   In addition, the disclosure must be one that would cause a <u>reasonable</u> person "physical injury, financial injury, or serious emotional distress." <u>Id</u>. § 2606(a)(2), (b)(1).  The statute is not designed to protect overly fragile sensibilities, and does not reach even knowing, nonconsensual disclosures of images falling within the narrow statutory parameters unless disclosure would cause a reasonable person to suffer harm.

¶ 64.   Two additional limitations assuage any concern that some content meeting all of these requirements may nonetheless implicate a matter of public concern.  First, the statute does not purport to reach "[d]isclosures made in the public interest, including the reporting of unlawful conduct, or lawful and common practices of law enforcement, criminal reporting, corrections, legal proceedings, or medical treatment." <u>Id</u>. § 2606(d)(2).  This broad and nonexclusive list of permitted disclosures is designed to exclude from the statute's reach disclosures that do implicate First Amendment concerns—those made in the public interest.  Second, even if a disclosure is not made "in the public interest," if the materials disclosed "constitute a matter of public concern," they are excluded from the statute's reach. <u>Id</u>. § 2606(d)(3).  The Legislature has made every effort to ensure that its prohibition is limited to communication of purely private matters with respect to which the State's interest is the strongest and the First Amendment concerns the weakest.

¶ 65.   Finally, to ensure that the statute reaches only those disclosures implicating the right to privacy the statute seeks to protect, it expressly excludes "[i]mages involving voluntary nudity or sexual conduct in public or commercial settings or in a place where a person does not have a reasonable expectation of privacy." <u>Id</u>. § 2606(d)(1).  Where an individual does not have

---

[10]   We express no opinion as to whether this narrowing element is essential to the constitutionality of the statute.  See D. Citron & M. Franks, <u>supra</u>, at 387 (arguing that malicious motive requirements are not required by First Amendment and are irrelevant to harms nonconsensual pornography statutes are designed to avert).  We highlight this limitation only to emphasize that this statute does not purport to reach disclosures made for purposes other than profit or to cause harm to the person depicted.

29

a reasonable expectation of privacy in an image, the State's interest in protecting the individual's privacy interest in that image is minimal. The statute recognizes this fact.

¶ 66.   In connection with this factor, we offer a narrowing construction, or clarification of the statute to ensure its constitutional application while promoting the Legislature's goals. See Tracy, 2015 VT 111, ¶ 28 (noting our obligation to construe statutes to avoid constitutional infirmities where possible, and to avoid facial challenges if there is readily apparent construction of statute that can rehabilitate constitutional infirmity). The statute's exclusion of otherwise qualifying images involving voluntary nudity or sexual conduct in settings in which a person does not have a reasonable expectation of privacy, 13 V.S.A. § 2606(d)(1), does not clearly reach images recorded in a private setting but distributed by the person depicted to public or commercial settings or in a manner that undermines any reasonable expectation of privacy. From the perspective of the statute's goals, there is no practical difference between a nude photo someone voluntarily poses for in the public park and one taken in private that the person then voluntarily posts in that same public park. Given the Legislature's clear intent to protect peoples' reasonable expectations of privacy in intimate images of them, and to exclude from the statute's reach those images in which a person has no such reasonable expectation, it seems clear that the Legislature intends its exclusion to apply to images the person has distributed to the public, as well as those recorded in public. This construction also ensures that the scope of the statute is no broader than necessary to advance the State's interest in protecting reasonable expectations of privacy with respect to intimate images.

¶ 67.   Given this narrowing construction, as well as all the express limitations on the statute's reach built into § 2606, we conclude that it is narrowly tailored to advance the State's compelling interest.

¶ 68.   We reject defendant's suggestion that civil penalties are necessarily less restrictive than criminal penalties, and that because the statute includes criminal penalties as well as the potential for civil liability it is broader than necessary to advance the State's interest. The Supreme

30

Court has acknowledged that civil and criminal penalties do not stand in a clear hierarchy from the perspective of chilling speech. In Sullivan, the Court explained, "What a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel. The fear of [civil] damage awards . . . may be markedly more inhibiting than the fear of prosecution under a criminal statute." 376 U.S. at 277. In fact, the Court noted that people charged criminally enjoy greater procedural safeguards than those facing civil suit, and the prospect of steep civil damages can chill speech even more than that of criminal prosecution. Id.[11] See also Garrison, 379 U.S. at 67 n.3 ("Whether the libel law be civil or criminal, it must satisfy relevant constitutional standards.").

¶ 69. For the above reasons, the statute is narrowly tailored to advance the State's interests, does not penalize more speech than necessary to accomplish its aim, and does not risk chilling protected speech on matters of public concern. We accordingly conclude that 13 V.S.A. § 2606 is constitutional on its face.

¶ 70. This Court may affirm the trial court's judgment on any basis, even if not relied upon by the trial court or briefed by the parties. See Gilwee v. Town of Barre, 138 Vt. 109, 111, 412 A.2d 300, 301 (1980) (noting that this Court would not reverse trial court if record revealed any legal ground justifying result, as "[a] trial court can achieve the right result for the wrong reason"); see also Kuligoski v. Rapoza, 2018 VT 14, ¶ 1, __ Vt. __, 183 A.3d 1145 (affirming on

---

[11] We recognize that the Court has more recently acknowledged the chilling effect that severe criminal sanctions may cause, especially where the content-based proscriptions were vague. Reno v. Am. Civil Liberties Union, 521 U.S. 844, 871-72 (1997). In Reno, the Court concluded that the criminal penalties for knowingly sending obscene or indecent messages to a recipient under eighteen years of age or knowingly sending patently offensive messages in a manner that is available to a person under eighteen years of age, coupled with the risk of discriminatory enforcement of the vague regulations, posed greater First Amendment concerns than implicated by a similar civil regulation it approved in a prior case. Id. at 877-78. But the Court's conclusion on that point does not support defendant's assertion that the State could permissibly impose civil penalties for nonconsensual pornography but not criminal penalties, or that civil penalties are, across the board, a less restrictive means of regulating content-based speech. The question is whether the statute is sufficiently vague or broad, and the criminal penalties sufficiently steep, to raise the specter of chilling constitutionally protected expression.

31

a different basis than relied upon by trial court); <u>McGee v. Gonyo</u>, 2016 VT 8, ¶ 1, 201 Vt. 216, 140 A.3d 162 (same). Defendant's arguments before the trial court that (1) on the basis of the alleged and stipulated-to facts, the State cannot prove that complainant had a reasonable expectation of privacy (and § 2606 is therefore inapplicable) and (2) even if the statute is constitutional on its face, application of the statute to these facts would run afoul of the First Amendment, provide two alternate bases for affirming the trial court's dismissal of the State's charges. The State may only proceed with this prosecution if it overcomes both of these arguments. Because these are both issues that we review without deference to the trial court, we should resolve these issues before remanding this case for further proceedings or affirming the trial court's dismissal of the State's charges.

¶ 71. The trial court's decision and the parties' briefs in connection with the State's petition focus almost entirely on the facial challenge. Considering that this is the first opportunity we have had to apply § 2606, we are not inclined to issue a dispositive ruling about the statute's application to these alleged facts without robust briefing by the parties. Accordingly, we direct the parties to brief the "as applied" and statutory issues in light of our above analysis.

<u>We withhold any mandate pending further briefing and decision on these issues. Defendant's brief concerning the "as applied" and statutory issues is due sixty (60) days after this decision issues. Thereafter, deadlines for the State's responsive brief and defendant's reply brief will be pursuant to the Vermont Rules of Appellate Procedure.</u>

FOR THE COURT:



Associate Justice

¶ 72. **SKOGLUND, J., dissenting.** Defendant raises a constitutional challenge to Vermont's version of a so-called "revenge porn" statute, 13 V.S.A. § 2606. The trial court found the statute abridges freedom of speech protected by the First Amendment and, thus, was unconstitutional. I agree and would affirm on that basis.

¶ 73. Section 2606, entitled "Disclosure of sexually explicit images without consent," was enacted in 2015 as part of a national attempt to criminalize revenge-porn dissemination, or what is sometimes described as "nonconsensual pornography," and thus safeguard sexual autonomy in the digital age. See generally R. Patton, Taking the Sting Out of Revenge Porn: Using Criminal Statutes to Safeguard Sexual Autonomy in the Digital Age, 16 Geo. J. of Gender & L. 407 (2015). It was an attempt to protect against the mortifying consequences of sexting—the making and sending of explicit pictures of oneself using digital devices. Forty states have acknowledged these issues and enacted legislation to address them. Cyber Civil Rights Initiative, 40 States + DC Have Revenge Porn Laws, https://www.cybercivilrights.org/revenge-porn-laws/ [https://perma.cc/83UK-KKUS] (collecting state statutes). Under Section 2606, Vermont prohibits "knowingly disclos[ing] a visual image of an identifiable person who is nude or who is engaged in sexual conduct, without his or her consent, with the intent to harm, harass, intimidate, threaten, or coerce the person depicted and the disclosure would cause a reasonable person to suffer harm." 13 V.S.A. § 2606(b)(1).

¶ 74. The affidavits and stipulated facts described the following. Complainant took photographs of herself while nude or partially nude and sent them to Anthony Coon's Facebook Messenger account. Coons and complainant were not in a relationship, nor did he request she send the photographs. The photographs themselves were not introduced into evidence—the parties agreed they met the definition of "nude" in § 2606(a)(3), but that they were not necessarily obscene. Though defendant did not have permission from Mr. Coon to access his Facebook account, she did so and discovered the photographs complainant sent. Defendant posted the photographs onto a public Facebook page and "tagged" complainant in them. For purposes of the motion to dismiss, defendant admitted that she did this for revenge and to get back at complainant for her prior relationship with Mr. Coon and for sending him the nude photographs.

¶ 75. The trial court found that the "merely 'nude' photographs" could not be considered obscene and therefore were a protected form of speech and not subject to the "narrow and well-

33

defined classes of expression" that are seen to carry "so little social value . . . that the State can prohibit and punish such expression." Connick v. Myers, 461 U.S. 138, 147 (1983). The court then reasoned that, in this content-discrimination case, because the images were not obscene, it had to review the statute and its prohibitions under a strict scrutiny basis. It further opined that the element of "revenge" in the statute did not allow for enlargement of unprotected speech under the First Amendment.

¶ 76. "A challenge to the constitutionality of a statute is reviewed de novo." United States v. Berry, 683 F.3d 1015, 1020 (9th Cir. 2012); see United States v. Osinger, 753 F.3d 939, 943 (9th Cir. 2014); Badgley v. Walton, 2010 VT 68, ¶ 4, 188 Vt. 367, 10 A.3d 469 ("We review a trial court's legal conclusions de novo.").

¶ 77. Because it is clear that the statute criminalizes the distribution of images based on their content—"a visual image of an identifiable person who is nude or who is engaged in sexual conduct, without his or her consent"—the trial court correctly reviewed it as a content-based restriction on speech. 13 V.S.A. § 2606(b)(1). The U.S. Constitution "demands that content-based restrictions on speech be presumed invalid and that the Government bear the burden of showing their constitutionality." Ashcroft v. Am. Civil Liberties Union, 542 U.S. 656, 660 (2004) (citation omitted); see also United States v. Alvarez, 567 U.S. 709, 716-17 (2012). "Content-based laws . . . may be justified only if the government proves that they are narrowly tailored to serve compelling state interests," Reed v. Town of Gilbert, 135 S. Ct. 2218, 2226 (2015), and there is no "less restrictive alternative" available that would serve the government's purpose. United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 813 (2000).

¶ 78. Section 2606 is not "narrowly tailored to promote a compelling Government interest." Id.; see also United States v. Stevens, 559 U.S. 460, 468-69 (2010). Moreover, a less restrictive alternative exists. Playboy Entm't Grp., Inc., 529 U.S. at 813. Therefore, I would affirm the trial court's order holding that the statute cannot survive strict scrutiny.

¶ 79.   To avoid the rigorous demands of strict scrutiny review, the State principally argues on appeal that the conduct regulated by § 2606 is not constitutionally protected expression, claiming that "nonconsensual porn" falls into certain categories of content-based restrictions that have been permitted historically and traditionally.  Alternatively, the State argues that, because revenge porn invades the depicted person's reasonable expectation of privacy, this Court should conclusively establish a new category for "nonconsensual pornography."

¶ 80.   As the majority holds, "the speech restricted by Vermont's statute cannot be fairly categorized as constitutionally unprotected obscenity." Ante, ¶ 28. I agree.  However, the majority then focuses on whether Section 2606 is narrowly tailored to serve a compelling State interest and concludes that the Vermont statute survives strict scrutiny, and there we part ways.

¶ 81.   First, I do not agree that the government has a compelling interest.  Does the statute relate to matters of public concern?  Speech deals with matters of public concern when it can be "fairly considered as relating to any matter of political, social, or other concern to the community." Connick, 461 U.S. at 146.  I agree the speech protected by the statute cannot be considered as relating to matters of public concern and, thus, does not carry as much weight in the strict scrutiny analysis as speech concerning matters of public concern.  "First Amendment protections are often less rigorous . . . because restricting speech on purely private matters does not implicate the same constitutional concerns as limiting speech on matters of public interest."  Snyder v. Phelps, 562 U.S. 443, 452 (2011).  Can revenge porn cause extreme emotional distress?  Oh, yes.  However, while the majority finds a compelling State interest in preventing the nonconsensual disclosure of nude or sexual images of a person obtained in the context of a confidential relationship, I cannot agree that, in this day and age of the internet, the State can reasonably assume a role in protecting people from their own folly and trump First Amendment protections for speech.

¶ 82.   Next, the statute fails to survive strict scrutiny because it is not narrowly tailored, nor does it provide the least restrictive means of dealing with the perceived problem.  As explained above, the statute criminalizes dissemination of nude imagery or any sexual conduct of a person

35

without that person's consent and with a bad motive. Reduced to its essential purpose, it criminalizes an invasion of personal privacy.

¶ 83. My primary war with the statute is simply this. The State has at its disposal less restrictive means to protect Vermonters against invasion of their privacy than subjecting a violator to a criminal penalty. Section 2606 does provide for a civil remedy. Subsection (e) provides plaintiff a private cause of action against a defendant who knowingly discloses, without the plaintiff's consent, an identifiable visual image of the plaintiff while he or she is nude or engaged in sexual conduct and the disclosure causes the plaintiff harm. It also provides for relief in the form of equitable relief, a temporary restraining order, a preliminary injunction or permanent injunction. While the State argued that the private right of action may fail to deter and punish publishers of nonconsensual pornography because "[m]ost victims lack resources to bring lawsuits, [and] many individual defendants are judgment-proof," the potential success of a private right of action is irrelevant in determining whether less restrictive alternative exists. One could always bring an action alleging intentional infliction of emotional distress. The Legislature could provide for triple damages and require that attorney's fees be awarded the prevailing party. There is a myriad of ways to provide protection to people short of criminal charges.

¶ 84. The statute's ambiguities concerning the scope of its coverage, even with the limiting interpretation crafted by the majority, coupled with its increased deterrent effect as a criminal statute, raise special First Amendment concerns because of its obvious chilling effect on free speech. "Criminal punishment by government, although universally recognized as a necessity in limited areas of conduct, is an exercise of one of government's most awesome and dangerous powers." Ginzburg v. United States, 383 U.S. 463, 477 (1966) (Black, J., dissenting). While disseminating "revenge porn" may be a repulsive and harmful action, the statute's attempt to criminalize this behavior runs afoul of the rights and privileges of the First Amendment. When content-based speech regulation is in question, exacting scrutiny is required. And, the burden placed on free speech due to its content is unacceptable if less restrictive alternatives would be at

least as effective in achieving the statute's purposes. Civil avenues exist that can avenge an invasion of privacy or a deliberate infliction of emotional distress without criminalizing speech based on the content of the message. As the Supreme Court has said, "[s]tatutes suppressing or restricting speech must be judged by the sometimes inconvenient principles of the First Amendment." Alvarez, 567 U.S. at 715. And, the First Amendment protects us all with an even hand.

¶ 85.   I would affirm on this basis.

_____
                    Associate Justice

**As supplemented following additional briefing and oral argument.**

¶ 86.   **ROBINSON, J.**   We now resolve the question of whether the trial court's dismissal of the State's charge against defendant for nonconsensual disclosure of images of an identifiable nude person under 13 V.S.A. § 2606 was proper on the basis that the State failed to present sufficient evidence to show that complainant, the person depicted in the images, had a reasonable expectation of privacy in those images. We conclude that because the State's evidence, taken in the light most favorable to the State, does not establish that complainant had a reasonable expectation of privacy in the images, the State has failed to make out a prima facie case. Accordingly, we affirm the dismissal of the charge pursuant to Vermont Rule of Criminal Procedure 12(d) and deny the State's petition for relief.[12]

¶ 87.   The evidence before the trial court in connection with the motion to dismiss reflects the following. Complainant sent nude pictures of herself to Anthony Coon via Facebook

---

[12]   In ruling on the constitutionality of § 2606, we indicated we were granting the State's petition for extraordinary relief, and agreed to assert jurisdiction over the State's claims pursuant to Vermont Rule of Appellate Procedure 21. Supra, ¶ 1. We withheld our mandate following that decision and clarify that we are now denying the State's petition.

Messenger, Facebook's private messaging service. Her sworn statement reflects that on October 8, 2015, multiple people contacted her to report that the nude photos of her had been publicly posted on Mr. Coon's Facebook page and she had been tagged in them. Complainant initially tried to untag herself but was unable to. She eventually deleted her account. She left Mr. Coon a telephone message asking that he delete the pictures from Facebook. Complainant then received a call from Mr. Coon's phone number. The caller was defendant. Defendant called complainant a pig and said she was going to tell complainant's employer, a child-care facility, about "what kind of person work[ed] there." Defendant said that she had left her "ex" for Mr. Coon. Complainant asked defendant to remove the pictures from Facebook, and defendant replied that she was going to "ruin" complainant and "get revenge." After that call ended, complainant contacted the police.

¶ 88.   Complainant reported that the night before the pictures were publicly posted, a friend told her defendant was asking about her and claiming Mr. Coon was her boyfriend. Upon learning this, complainant asked Mr. Coon about defendant, and Mr. Coon said that defendant was obsessed with him and he never slept with her. Complainant "took it as him being honest so we moved on."

¶ 89.   The investigating officer spoke with defendant over the phone. Defendant admitted that she saw the nude pictures of complainant through Mr. Coon's Facebook account and that she posted the pictures on Facebook through Mr. Coon's account. Defendant stated to the officer, "you think she [complainant] learned her lesson."

¶ 90.   In reviewing the State's motion, the trial court later asked the parties to stipulate to additional facts, if possible, concerning when the photographs were sent, whether complainant sent them while in or after ending a relationship with Mr. Coon, and how defendant had access to Mr. Coon's Facebook account. The parties stipulated that complainant sent Mr. Coon the photos on October 7, and they were posted on a public Facebook page on October 8. They further stipulated that "complainant was not in a relationship with Mr. Coon at the time the photographs were sent to Mr. Coon." Finally, they stipulated that defendant did not have permission to access Mr. Coon's

Facebook account, and Mr. Coon believes defendant gained access to his account through her phone, which had his Facebook password saved on it.

¶ 91. In defendant's motion to dismiss, she argued that § 2606 violated the First Amendment to the U.S. Constitution and Article 13 of the Vermont Constitution because it restricted protected speech and it could not survive strict scrutiny. She also asserted that complainant had no reasonable expectation of privacy because she took the pictures herself and messaged them to Mr. Coon without any promise on his part to keep the pictures private, citing § 2606(d)(1), which excludes from the statute's reach dissemination of "[i]mages involving voluntary nudity or sexual conduct in public or commercial settings or in a place where a person does not have a reasonable expectation of privacy."

¶ 92. The trial court held that the statute was subject to strict scrutiny because it restricted protected speech and did not survive strict scrutiny because the State had failed to show that there were no less restrictive alternatives available, and it accordingly dismissed the charge. The court did not address defendant's argument that complainant had no reasonable expectation of privacy in the images.

¶ 93. The State sought permission to appeal the trial court's decision on defendant's motion to dismiss, and the trial court granted the request. Because the trial court issued a final judgment dismissing the State's charges before it received the State's motion for permission to appeal pursuant to 13 V.S.A. § 7403(a), thereby leaving the State without an avenue for appeal or relief through the trial court, we treated the request as a petition for extraordinary relief pursuant to Vermont Rule of Appellate Procedure 21.

¶ 94. We first addressed the facial constitutionality of § 2606. We held that the images to which it applies do not fall within an established categorical exception to full First Amendment protection. However, we held that the statute survives strict scrutiny because it is narrowly tailored to serve the State's compelling interest in regulating this form of speech, which because of its purely private nature has low constitutional significance, and which has the potential to cause

39

severe harm to the individuals depicted in the images. To avoid potential constitutional infirmity, we provided a narrowing construction of the statute's provision excluding from the statute's reach images involving nudity or sexual conduct in a setting in which the depicted person does not have a reasonable expectation of privacy. In particular, we clarified that this should also be understood to exclude from the statute's reach "images <u>recorded</u> in a private setting but <u>distributed</u> by the person depicted to public or commercial settings or in a manner that undermines any reasonable expectation of privacy." <u>Supra</u>, ¶ 66. Although we upheld the facial validity of the statute, we concluded that the State could proceed with the prosecution only if it could show that (a) complainant had a reasonable expectation of privacy in the images, and (b) the statute is constitutional as applied. <u>Id</u>. ¶ 70. Before rendering final judgment affirming or reversing the trial court's dismissal of the charge, we requested briefing and allowed argument on these questions.[13]

¶ 95. The State argues that the alleged and stipulated facts establish a prima facie violation of the elements listed under § 2606(b)(1). It contends that the "reasonable expectation of privacy" consideration is not an element of a prima facie charge that the State must prove; that the evidence presented is sufficient to permit a jury to conclude that complainant had a reasonable expectation of privacy in the images she sent; and that the case should be remanded to allow the State to present additional evidence showing that complainant had a reasonable expectation of privacy in the images, given this Court's narrowing construction of § 2606(d)(1). The State contends that the stipulation that complainant and Mr. Coon were not in a relationship at the time she sent him the pictures does not show that she had no reasonable expectation of privacy in the images, as "the nature of the relationship between complainant and Mr. Coon is not at all clear from the record" and "a traditional romantic relationship is not a prerequisite to private communication."

---

[13] In taking this step, we noted that we may affirm a trial court's judgment on any basis, even if not relied upon by the trial court; the alternate basis for dismissal—failure to prove a prima facie case under the statute—was raised and briefed below; and that question is a pure question of law that we review without deference. <u>Supra</u>, ¶ 70.

40

¶ 96.   We review motions to dismiss without deference to the trial court. State v. Scales, 2019 VT 7, ¶ 8, __ Vt. __, __ A.3d __.  The court must dismiss an "indictment or information on the ground that the prosecution is unable to make out a prima facie case" if the State cannot "establish by affidavits, depositions, sworn oral testimony, or other admissible evidence that it has substantial, admissible evidence as to the elements of the offense . . . sufficient to prevent the grant of a motion for judgment of acquittal at the trial."  V.R.Cr.P. 12(d)(1)-(2).  In making this determination, we "review the evidence in the light most favorable to the State, excluding modifying evidence, and determine whether that evidence would fairly and reasonably tend to show defendant committed the offense, beyond a reasonable doubt."  Scales, 2019 VT 7, ¶ 9 (quotations omitted).

¶ 97.   We conclude that dismissal is appropriate because the State has not established that it has evidence showing that complainant had a reasonable expectation of privacy in the images she sent to Mr. Coon.  The statutory exception for images taken in a setting where there was no reasonable expectation of privacy, or previously distributed in a manner that undermined that expectation of privacy, is fundamental to the constitutionality and purpose of this statute, and must be understood as an element of the crime.  The State bears the burden of establishing that it has evidence as to each element of the offense, including this one.  Because the State has stipulated that complainant and Mr. Coon were not in a relationship at the time complainant sent Mr. Coon the photo, and there is no evidence in the record showing they had any kind of relationship engendering a reasonable expectation of privacy, we conclude the State has not met its burden.

¶ 98.   The requirement that the images at issue be subject to a reasonable expectation of privacy is central to the statute's constitutional validity under a strict-scrutiny standard.  A content-based restriction on First Amendment-protected speech like § 2606 can withstand strict scrutiny only if it is narrowly tailored to serve a compelling state interest.  Williams-Yulee v. Fla. Bar, 135 S. Ct. 1656, 1666 (2015).  The compelling state interest underlying § 2606 is "to protect people['s] reasonable expectations of privacy in intimate images of them," and prevent the serious harms that

41

can result when those expectations are broken. Supra, ¶¶ 57, 66. We noted that "[w]here an individual does not have a reasonable expectation of privacy in an image, the State's interest in protecting the individual's privacy interest in that image is minimal." Id. ¶ 65. Where the State has only a minimal interest at stake—such as where the individual depicted did not have a reasonable expectation of privacy—a prosecution under § 2606 would not be a justifiable incursion upon First Amendment-protected speech. Our conclusion that § 2606 is narrowly tailored insofar as it penalizes only the disclosure of images in which the depicted person had a reasonable expectation of privacy rested in part on our construction that the statute would apply only where the person depicted had not distributed the images in a way that would undermine their reasonable expectation of privacy. Id. ¶ 66.

¶ 99. Because the protection of reasonable expectations of privacy in intimate images is central to the statute's constitutionality and purpose, the reasonable-expectation-of-privacy provision must be understood as an element of the crime. "[A]n element is that which defines or describes the crime." Fraser v. Sleeper, 2007 VT 78, ¶ 11, 182 Vt. 206, 933 A.2d 246. In determining whether a statutory exception is an element or a defense, the "question is whether the exception is so incorporated with the substance of the clause defining the offense, as to constitute a material part of the description of the acts, omissions, or other ingredients which constitute the offense." State v. Bevins, 70 Vt. 574, 577, 41 A. 655, 656 (1898) (quotation omitted); see also State v. McCaffrey, 69 Vt. 85, 90, 37 A. 234, 235-36 (1896) (reciting that statutory "exceptions must be negatived" by State "only where they are descriptive of the offense, or define it"). "Provisions that make an excuse or exception to the definition, particularly those principally within the knowledge of the defendant, are defenses." Fraser, 2007 VT 78, ¶ 11.

¶ 100. We acknowledge that the structure of § 2606, as set forth below, weighs in favor of finding the reasonable-expectation-of-privacy requirement to be a defense because its positioning makes it appear to be an excuse or exception to the definition of the crime:

42

(b)(1) A person violates this section if he or she knowingly discloses a visual image of an identifiable person who is nude or who is engaged in sexual conduct, without his or her consent, with the intent to harm, harass, intimidate, threaten, or coerce the person depicted, and the disclosure would cause a reasonable person to suffer harm. . . .

. . . .

(d) This section shall not apply to:

(1) Images involving voluntary nudity or sexual conduct in public or commercial settings or in a place where a person does not have a reasonable expectation of privacy.

¶ 101. But the very essence of this crime is that it is a violation of the depicted person's reasonable expectation of privacy. As the State aptly put it in its opening brief, "the conduct regulated by 13 V.S.A. § 2606" is "publicly disseminating someone's <u>private</u> nude pictures without their consent" and "Section 2606 thus generally prohibits disclosing a person's nude or sexually explicit pictures <u>if the person had a reasonable expectation of privacy</u> in the picture and did not consent to its disclosure." (Emphases added.) This statute is constitutional because it furthers the State's compelling interest in preventing the harms that flow from the nonconsensual disclosure of nude images obtained in the context of intimate relationships or other relationships in which there is a reasonable expectation of privacy (for example, patient-dermatologist). The requirement that the disclosed images were neither taken in a setting where there was no reasonable expectation of privacy, nor distributed by the person depicted in a manner that undermined that expectation of privacy, "defines or describes the crime." <u>Fraser</u>, 2007 VT 78, ¶ 11. Although phrased as an exception, it is an essential "ingredient[] which constitute[s] the offense." <u>Bevins</u>, 70 Vt. at 577, 41 A. at 656. It is an element of the crime.

¶ 102. Our conclusion that the reasonable-expectation-of-privacy requirement is an element, not a defense, is bolstered by the fact that the answer to whether the depicted person had a reasonable expectation of privacy in the images is not necessarily "within the knowledge of the defendant," let alone "principally" within the defendant's knowledge. See <u>Fraser</u>, 2007 VT 78,

43

¶ 11 (holding that provisions that "make an excuse or exception to the definition, particularly those principally within the knowledge of the defendant, are defenses"). Here, for instance, defendant has no apparent advantage over the State in determining the contours of complainant's relationship with Mr. Coon and whether that relationship engendered any reasonable expectation of privacy in the images complainant shared with Mr. Coon.

¶ 103. Because this reasonable-expectation-of-privacy requirement is an element of the crime, the State bears the burden of establishing that it has sufficient evidence as to this element to prevent the grant of a motion for judgment of acquittal at trial. V.R.Cr.P. 12(d)(2) (requiring that, on motion to dismiss for lack of prima facie case, State show "it has substantial, admissible evidence as to the elements of the offense challenged by the defendant's motion"); McCaffrey, 69 Vt. at 90, 37 A. at 235-36 (noting statutory "exceptions must be negatived" by State "where they are descriptive of the offense, or define it").

¶ 104. The State has not shown it has evidence that complainant had a reasonable expectation of privacy in the images she sent to Mr. Coon.[14] We understand this to be an objective standard, and find no evidence in the record showing that complainant had such a relationship with Mr. Coon that distributing the photos to him did not undermine any reasonable expectation of privacy that she had in them.

¶ 105. We interpret the reasonable-expectation-of-privacy standard as a purely objective one because the Legislature specified that the statute shall not apply to "[i]mages involving voluntary nudity or sexual conduct . . . where a person does not have a reasonable expectation of privacy." § 2606(d)(1) (emphases added). This reflects a decision by the Legislature that the expectation-of-privacy determination should be based on what a reasonable person would think,

_____

[14] Although the State argues it would be prejudicial to dismiss the charge without remanding to allow it to present evidence showing that complainant had a reasonable expectation of privacy in the images she sent to Mr. Coon, we find this unnecessary. The State has already stipulated that complainant and Mr. Coon were not in a relationship. It has not indicated what, if any, evidence it could introduce that would show they did, in fact, have the type of relationship that would give rise to a reasonable expectation of privacy.

not what the person depicted thought. State v. Albarelli, 2011 VT 24, ¶ 14, 189 Vt. 293, 19 A.3d 130 (noting objective standard turns on what reasonable person would think).[15] We do not attempt to precisely define here where and when a person may have a reasonable expectation of privacy for the purposes of § 2606(d)(1), except to note that it generally connotes a reasonable expectation of privacy within a person's most intimate spheres. Privacy here clearly does not mean the exclusion of all others, but it does mean the exclusion of everyone but a trusted other or few.[16]

¶ 106. We conclude that the State has not shown, as we held it must, supra, ¶¶ 66, 70, that the images were not distributed by the person depicted in a manner that undermined any reasonable expectation of privacy. As the State acknowledged in its briefing, "it is difficult to see how a complainant would have a reasonable expectation of privacy in pictures sent to a stranger." But the State has not presented evidence to demonstrate that, in contrast to a stranger, Mr. Coon had a relationship with complainant of a sufficiently intimate or confidential nature that she could reasonably assume that he would not share the photos she sent with others. Nor has it offered evidence of any promise by Mr. Coon, or even express request by complainant, to keep the photos confidential. The State stipulated that complainant and Mr. Coon were not in a relationship at the time complainant sent the pictures. In the face of this stipulation, the facts that complainant and

---

[15] We note that case law construing a criminal defendant's reasonable expectation of privacy for the purposes of the Fourth Amendment is of little help in determining whether the subject of an image has a reasonable expectation of privacy under § 2606(d)(1). "Whether or not a search is reasonable under the Fourth Amendment depends on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." State v. Kane, 2017 VT 36, ¶ 26, 204 Vt. 462, 169 A.3d 762 (quotation omitted). Because a reasonable expectation of privacy under § 2606(d)(1) requires no analogous balancing of legitimate law-enforcement interests, the tests are fundamentally different. Although we are using the same phrase—"reasonable expectation of privacy"—it does not necessarily have the same meaning in this context that it would in the Fourth Amendment setting.

[16] The definition of privacy for the purposes of the tort of invasion of privacy is instructive: "Every individual has some phases of [their] life and . . . activities and some facts . . . that [they do] not expose to the public eye, but . . . reveal[] only to . . . family or to close friends. Sexual relations, for example, are normally entirely private matters, as are . . . unpleasant or disgraceful or humiliating illnesses," and "most intimate personal letters." Restatement (Second) of Torts § 652D cmt. b (1977).

Mr. Coon apparently knew each other, had each other's contact information, and had a conversation about whether Mr. Coon was sleeping with defendant, are not sufficient to support an inference that she had a reasonable expectation of privacy.[17] In sum, the State has not offered sufficient evidence to permit a jury to conclude beyond a reasonable doubt that complainant had a reasonable expectation of privacy in the photos she sent to Mr. Coon.[18]

<u>The petition for extraordinary relief is denied, and the decision below is affirmed</u>.

FOR THE COURT:

_____
Associate Justice

¶ 107. **SKOGLUND, J.**, **concurring.** I agree with the conclusion of the majority that the State failed to prove complainant had a reasonable expectation of privacy in the nude picture she sent to Mr. Coon. I continue to believe that the statute does not survive strict scrutiny and is unconstitutional on its face.

_____
Associate Justice

---

[17] Because we conclude that the State's evidence is insufficient to establish the requisite confidential relationship between complainant and Mr. Coon to support a reasonable expectation of privacy in the photos complainant sent him, we do not address two other arguments raised by defendant in support of the trial court's dismissal of the charge. In particular, we need not address whether the State presented sufficient evidence to permit a jury to conclude that defendant knew that complainant did not consent to the disclosure of her photos, and we need not analyze the extent to which the medium through which complainant conveyed the photos—Facebook Messenger—is consistent with a reasonable expectation of privacy.

[18] Because we affirm the dismissal of the charge, we need not reach the question of whether application of the statute to these facts would run afoul of the First Amendment.